# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 22, 2010          Decided March 8, 2011

No. 09-5372

RICHARD J. MENKES,
APPELLANT

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01456)

*Jonathan G. Axelrod* argued the cause and filed the briefs for appellant. *Edward M. Gleason Jr.* entered an appearance.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Claire Whitaker*, Assistant U.S. Attorney, entered an appearance.

Before: GINSBURG and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Opinion filed by *Circuit Judge* BROWN dissenting in part.

EDWARDS, *Senior Circuit Judge*: The Great Lakes Pilotage Act ("GLPA") sets forth certain requirements for persons who serve as pilots of vessels sailing on the waters of the Great Lakes. Under the statute, the United States Coast Guard ("Coast Guard" or "agency") is afforded discretion to "authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services." 46 U.S.C. § 9304(a). Pursuant to this statutory authority, the Coast Guard has promulgated regulations that provide for the formation of pools in three Great Lakes districts. 46 C.F.R. § 401.300. Under the applicable regulations, "[w]hen pilotage service is not provided by the association authorized under 46 U.S.C. 9304 because of a physical or economic inability to do so, . . . the Director [of Great Lakes Pilotage of the Coast Guard] may order any U.S. registered pilot to provide pilotage service." *Id.* § 401.720(b).

Appellant Richard Menkes was a member of the St. Lawrence Seaway Pilots' Association ("SLSPA" or "Association") – the only voluntary association designated by the Coast Guard to provide pilotage service in the district encompassing the St. Lawrence River and Lake Ontario. Menkes resigned from the SLSPA in 2000 and then requested the Coast Guard to dispatch him as an unaffiliated, independent pilot on the St. Lawrence River. In March 2001, Menkes was so assigned pursuant to § 401.720(b). In late 2003, the Coast Guard determined that Menkes's appointment as an independent pilot would "naturally expire" at the conclusion of the 2003 navigation season. The agency indicated that it would continue to monitor the SLSPA to determine whether the services of an independent pilot would be required during the 2004 season.

However, Menkes was never reassigned to serve on the St. Lawrence River in 2004.

In August 2004, Menkes filed suit against the United States Department of Homeland Security, the Coast Guard, and the Assistant Commandant of the Coast Guard (collectively "the Government"), challenging the Coast Guard's determination to terminate his appointment as an unaffiliated, independent pilot. Menkes claimed that the Government's action violated the Administrative Procedure Act ("APA"), as well as his First Amendment and Fifth Amendment rights. The District Court granted the Government's motion to dismiss. *Menkes v. Dep't of Homeland Sec.* ("*Menkes I*"), 402 F. Supp. 2d 204 (D.D.C. 2005). On appeal, we reversed and remanded the case. *Menkes v. Dep't of Homeland Sec.* ("*Menkes II*"), 486 F.3d 1307 (D.C. Cir. 2007). The District Court then remanded the case to the Coast Guard for further consideration.

After further review, the Coast Guard held that, under the statute and applicable regulations, a "voluntary association" under 46 U.S.C. § 9304 refers to a group of people "joined together for a certain purpose, and not a legal entity distinct from the persons who are members." See *Agency Decision on Remand* in the Appendix to this opinion. The Coast Guard held further that a certified voluntary association is not required to "dispatch every registered, licensed and qualified pilot who desires to provide pilotage services." *Id.* In other words, pilots who are not members of a designated voluntary association do not share in its responsibilities or privileges. The Coast Guard also determined that Menkes had no right to serve as an independent pilot during the 2004 navigation season, because, as of December 2003, the SLSPA appeared to have a sufficient number of pilots to provide pilotage service for the upcoming season.

Menkes again sought relief in the District Court. After reviewing cross-motions for summary judgment, the District

Court rejected Menkes's claims and granted judgment to the Government. *Menkes v. Dep't of Homeland Sec.* ("*Menkes III*"), 662 F. Supp. 2d 62 (D.D.C. 2009). On Menkes's APA claim, the District Court held that the Coast Guard reasonably concluded that Menkes's term of service as an independent pilot expired in 2003, and that Menkes had no entitlement to reassignment in 2004. The District Court also held that issue preclusion barred Menkes's First Amendment claim because the Second Circuit had ruled against Menkes on the same issue in a suit against the SLSPA. *Menkes v. SLSPA* ("*SLSPA*"), 269 F. App'x 54 (2d Cir. 2008). Finally, the District Court rejected Menkes's Fifth Amendment due process claim because he failed to demonstrate a viable property interest in an appointment to serve as a pilot in a specific area. Menkes timely appealed.

We affirm the judgment of the District Court. First, we hold that the Coast Guard's interpretation of the term "voluntary association" in 46 U.S.C. § 9304 easily survives review under *Chevron* Step Two. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) (holding that, once a court determines that Congress either explicitly or implicitly delegated to an agency the authority to fill a gap in its authorizing statute, the court must accept the agency's position if it is based on a "permissible" interpretation of the statute). Second, we agree with the District Court that Menkes's First Amendment claim appears to be precluded by the Second Circuit's judgment. In any event, the claim fails on the merits. Third, we hold that the Coast Guard did not act arbitrarily and capriciously in determining that Menkes's dispatch as an independent pilot expired after the 2003 navigation season. Fourth, we reject Menkes's Fifth Amendment due process claim, because Menkes had no constitutionally protected entitlement to continued dispatch by the Coast Guard. Finally, we hold that the District Court did not abuse its discretion in denying Menkes's request for extra-record discovery.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

In 1960, Congress passed the GLPA in order "to establish pilotage requirements for oceangoing vessels in their navigation of U.S. waters of the Great Lakes and St. Lawrence River and to provide a basis for a regulated pilotage system to meet those requirements." H.R. REP. NO. 86-1666, at 1 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2481, 2481. The statute, as amended, requires both U.S. and foreign vessels in these waters to "engage a United States or Canadian registered pilot for the route being navigated," 46 U.S.C. § 9302, and requires the Coast Guard to prescribe "standards of competency" that each applicant must meet in order to become a United States registered pilot, *id.* § 9303. Most pertinent to this appeal, it provides that:

> (a) The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.
>
> (b) For pilotage pools, the Secretary may –
>
>> (1) limit the number of the pools;
>>
>> (2) prescribe regulations for their operation and administration;
>>
>> (3) prescribe a uniform system of accounts;
>>
>> (4) perform audits and inspections; and
>>
>> (5) require coordination on a reciprocal basis with similar pool arrangements authorized by the appropriate agency of Canada.

*Id.* § 9304.

The Coast Guard has promulgated several regulations pursuant to the GLPA. Two of these regulations are particularly

important here: one, 46 C.F.R. § 401.300, authorizes voluntary associations of U.S. registered pilots to establish pools in three districts of the U.S. waters of the Great Lakes; the other, 46 C.F.R. § 401.720(b), provides that "[w]hen pilotage service is not provided by the association authorized under 46 U.S.C. 9304 because of a physical or economic inability to do so, . . . the Director [of Great Lakes Pilotage of the Coast Guard] may order any U.S. registered pilot to provide pilotage service." Only District One – which covers portions of the St. Lawrence River and Lake Ontario – is at issue in this case. *Id.* § 401.300(a)(1); *see also* Decl. of Paul M. Wasserman ¶¶ 10-11 (May 28, 2008), *reprinted in* Joint Appendix ("J.A.") 455-56.

District One is comprised of two areas: the waters in Area 1, which include portions of the St. Lawrence River, and the waters in Area 2, which include Lake Ontario. Decl. of Paul M. Wasserman ¶¶ 10-11 (May 28, 2008), J.A. 455-56. A single pilot can be qualified to navigate vessels in both areas, although Area 2 pilots must be qualified to navigate a vessel both into a port and from "pilot boat to pilot boat," *i.e.*, a vessel that is only passing through Lake Ontario. *Id.* ¶ 17, J.A. 459.

## B. *Procedural Background*

At all times relevant to this litigation, the SLSPA was the only pilotage pool authorized by the Coast Guard in District One. In order to become a member of the SLSPA, a pilot must be recommended by the voting members of the SLSPA and purchase one share (worth approximately $60,000) of Seaway Pilots Inc., the corporate entity through which the SLSPA purchases pilot boats and other property. Menkes was a member of the SLSPA until 2000, at which point he tendered his equity stake in Seaway Pilots Inc. and resigned from the Association. Following his resignation from the SLSPA, Menkes informed the Coast Guard that "I am still a U.S. Registered Pilot . . .[, and] I maintain my right to be dispatched." Letter from Richard J.

Menkes to Frank J. Flyntz, Director, Great Lakes Pilotage (July 24, 2000), *reprinted in* J.A. 138**.**

The Director of Great Lakes Pilotage of the Coast Guard, Frank J. Flyntz, dispatched Menkes as an independent pilot for the 2001 navigation season. Flyntz explained his actions as follows:

> Captain Menkes will remain in District [One] as a U.S. registered pilot and be available for dispatch whether or not he belongs to a pilotage pool. A pilotage pool is a *voluntary* association of registered pilots. 46 U.S.C. § 9304. There is no mandatory requirement in statute or regulation that requires Great Lakes registered pilots to belong to a pool in order to provide pilotage service. Captain Menkes' resignation from the SLSPA does not prevent him from being dispatched nor does it provide any basis for the Coast Guard to deny him the opportunity to continue to earn his livelihood as a U.S. registered pilot. Captain Menkes has a vested property right in his certificate of registration that the Coast Guard cannot revoke simply because he does not belong to a pilotage pool. . . . Furthermore, as I stated in my letter to the SLSPA dated February 26, 2001, there is a serious need for qualified pilots in District [One] and, as I previously determined, the SLSPA has not physically provided adequate pilotage service in accordance with 46 C.F.R. § 401.720(b).

Letter from F.J. Flyntz, Director, Great Lakes Pilotage to Roger Paulus, President, SLSPA at 1 (Mar. 7, 2001) (emphasis in original), *reprinted in* J.A. 131. The SLSPA appealed Flyntz's determination. The disputed decision was upheld, albeit on different grounds, by J.P. High, the Coast Guard's Director of Waterways Management. High concluded that, "[a]s the Director may order *any* U.S. Registered Pilot to provide pilotage service in situations such as those found by the Director to currently exist, I find that the Director's order to Captain

Menkes was a valid exercise of his authority [under 46 C.F.R. § 401.720(b)]." Letter from J.P. High, Director of Waterways Mgmt., to Mark Ruge, Preston, Gates, Ellis & Rouvelas, Meeds LLP at 3 (May 22, 2001) (emphasis in original), *reprinted in* J.A. 127.

Menkes served as an independent pilot in Area 1 of District One during the 2001, 2002, and 2003 navigation seasons. Each season runs from the end of March until the end of December. In August 2003, the SLSPA wrote then-Acting Director of the Office of Great Lakes Pilotage of the Coast Guard, Paul Wasserman, insisting that the Association was fully able to provide all necessary pilotage service in District One. Letter from SLSPA to Paul Wasserman, Acting Director, Office of Great Lakes Pilotage (Aug. 20, 2003), *reprinted in* J.A. 97. Wasserman disagreed in part and renewed the Coast Guard's determination that the SLSPA was unable to provide adequate pilotage service through the end of the 2003 navigation season. However, Wasserman stated that, at the end of the 2003 season "[this] determination, and Captain Menkes' appointment as an independent pilot, will naturally expire." Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Roger Paulus & Richard Menkes at 2 (Dec. 29, 2003), *reprinted in* J.A. 77. Wasserman added that he would "continue to monitor the status of the SLSPA after the 2003 navigation season to determine whether the services of any independent pilots will be required for the 2004 navigation season." *Id.* In a subsequent letter responding to Menkes's claim "that [his] status as an independent pilot in District One [was] a permanent circumstance," Wasserman made it clear that "[Menkes's] status as an independent pilot has been predicated on a determination by my office that an extraordinary circumstance exists, which I have not made for any future navigation seasons." Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Richard Menkes at 1 (Jan. 22, 2004), *reprinted in* J.A. 73.

Menkes's appeal of Wasserman's decision was rejected by T.J. Gilmour, the Assistant Commandant for Marine Safety. Gilmour found that Flyntz's 2001 decision to dispatch Menkes

> was based on [Flyntz's] determination that the SLSPA could not physically provide adequate pilotage service and there was a serious need for additional qualified pilots in District One. Captain Menkes' continued service as an independent pilot was, and is, contingent upon *that* extraordinary circumstance remaining in effect.

Letter from T.H. Gilmour, Real Admiral, U.S. Coast Guard to Edward M. Gleason, Beins, Axelrod, Kraft, Gleason & Gibson, P.C. ("Gilmour Letter") at 1 (Apr. 12, 2004) (emphasis added), *reprinted in* J.A. 68. Gilmour added that "Captain Menkes is free to apply to the SLSPA for membership in that association." *Id.* at 2, J.A. 69.

In August 2004, Menkes filed suit in the District Court against the Government, alleging that the Coast Guard violated his First Amendment associational rights, his Fifth Amendment due process rights, and the APA in determining that his appointment as an independent pilot in District One had expired. He sought injunctive relief, cease-and-desist orders, and such other relief as appropriate. The District Court granted the Government's motion to dismiss Menkes's claims under FED. R. CIV. P. 12(b)(1) and 12(b)(6). *Menkes I*, 402 F. Supp. 2d 204 (D.D.C. 2005). The court held that the Coast Guard's actions were "committed to agency discretion by law," and, accordingly, not reviewable under the APA. *Id.* at 207-09. In addition, the District Court dismissed Menkes's First Amendment claim on the ground that the Coast Guard had not required Menkes to join the SLSPA as a condition of employment, *id.* at 209-10, and it dismissed his Fifth Amendment claim on the ground that neither the statute nor the applicable regulations created "an entitlement to the

authorization of working as an independent pilot in a district with an approved pilotage pool," *id.* at 210.

On appeal, we reversed the District Court's judgment and vacated the decision of the Coast Guard. We first concluded that the Coast Guard's determination was reviewable under the APA. *Menkes II*, 486 F.3d at 1312-13. We declined, however, to address Menkes's statutory claim, because the Coast Guard had yet to offer an explicit interpretation of the statute or the applicable regulations. We explained that

> [i]t is not appropriate for us to decide appellant's statutory argument – that giving a preference to the Association conflicts with the controlling statute's use of "voluntary association" – at this time. We cannot pass comfortably on that question because we do not have a forthright agency interpretation of the statute. Paradoxically, the government argues that we should give deference to its interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). But putting aside the question raised by *United States v. Mead Corp.*, 533 U.S. 218 (2001) – whether an interpretation advanced only in an informal adjudication is entitled to deference – in this case we do not have an explicit agency interpretation of either the statute or the regulation to evaluate. To be sure, section 401.720(b) could be read to imply a preference for the Association. The Wasserman and Gilmour letters could also be read to suggest as much. But an implication is not an agency interpretation, and we are disinclined to tease out, from the welter of correspondence in this case, an interpretation the agency itself has failed to offer. The statutory question is potentially a difficult one. The Coast Guard must come to grips with the meaning of the statute, and, particularly, the meaning of the term "voluntary association." An agency interpretation is not only

necessary to meet appellant's administrative law challenge, it is also essential . . . to meet his constitutional claims.

*Id*. at 1313-14 (footnote omitted).

We likewise declined to evaluate Menkes's argument that the agency acted arbitrarily and capriciously in denying him an appointment for the 2004 navigation season, noting that "the Coast Guard has offered no explanation regarding the changed conditions from the 2003 to 2004 navigation season, and on remand it will be obliged to do so." *Id.* (footnote omitted). The case was remanded "to the district court with instructions to remand the APA claim to the Coast Guard for further proceedings." *Id*. at 1315. The District Court was instructed to "retain jurisdiction over appellant's constitutional claims, but hold them in abeyance pending the Coast Guard's response to the remand." *Id*.

On remand, the agency "invite[d] Mr. Menkes to submit any evidence or arguments he would like the Coast Guard to consider." Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Jonathan G. Axelrod, Benis[sic], Axelrod & Kraft, P.C. at 1 (Aug. 9, 2007), *reprinted in* J.A. 317. Menkes's counsel wrote the agency and contended that: (1) a Coast Guard-designated "voluntary association" is required to dispatch willing, registered pilots regardless of whether they are members of the association; (2) the Coast Guard erred in determining that Menkes's status as an independent pilot expired at the conclusion of the 2003 navigation season; and (3) the Coast Guard never found that the SLSPA could provide adequate pilotage service for the 2004 navigation season. Letter from Jonathan G. Axelrod to Paul M. Wasserman, Director, Great Lakes Pilotage (Oct. 9, 2007), *reprinted in* J.A. 336-47.

In an exhaustive decision, the Coast Guard addressed the issues raised by this court in *Menkes II* and by Menkes's counsel in his submission on remand. In this decision, the Coast Guard

set forth in detail the agency's interpretation of "voluntary association" under 46 U.S.C. § 9304, explained the rights and responsibilities of such associations under the statute and agency regulations, and clarified the rights of unaffiliated, independent pilots. The principal judgments made by the Coast Guard are as follows:

- The statutes governing Great Lakes pilotage and the implementing Coast Guard regulations do not require certified pilots' associations to dispatch every registered, licensed, and qualified pilot who desires to provide pilotage services.

- Certificated pilots' associations are primarily responsible for providing adequate pilotage services, and that includes deciding whether or not to dispatch non-member pilots.

- Only when a certificated pilots' association is not providing adequate pilotage service would the Director deviate from the policy of placing primary responsibility for providing pilotage service with the certificated pilots' association and intervene to ensure that adequate pilotage service is provided or notify vessels that a pilot is not available. This is a longstanding policy based in part on the Coast Guard's interpretation of the Great Lakes pilotage regulations, dating at least back to about 1975.

- The Coast Guard does not interpret the phrase "voluntary association" found in 46 U.S.C. § 9304, and in the Coast Guard's implementing regulations, to mean that a certificated pilots' association must dispatch every registered, licensed, and qualified pilot who desires to provide pilotage service. Any such language in Flyntz's letter was never an authoritative statement of the agency's interpretation of the phrase "voluntary association."

- Since Congress has not provided a specific meaning or definition for the phrase "voluntary association," the Coast

Guard may interpret the phrase to give it a meaning that is reasonable and consistent with the purpose of 46 U.S.C. § 9304 and 46 U.S.C. Chapter 93 as a whole.

- An association is a collection of persons joined together for a certain object, and an unincorporated association is not a legal entity distinct from the persons who are members. Membership in a voluntary unincorporated association is generally held to be a privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced. Congress used the phrase "voluntary association" to mean only a collection of persons joined together for a certain purpose, and not a legal entity distinct from the persons who are members. The Coast Guard considers this to be a reasonable interpretation of the phrase as it is used in 46 U.S.C. § 9304, and this meaning is consistent with the purpose of that provision and 46 U.S.C. Chapter 93 as a whole.

- If Congress had intended 46 U.S.C. § 9304 to have the meaning that Menkes asserts, it would have used the word "voluntary" with "pool" to indicate that the pool should be open to anyone wanting to provide pilotage service; although, even in that case, the intent of the phrase would not be plain. But, as it is, Congress used the phrase "voluntary association." Interpreting the word voluntary to mean that the association should be open to anyone wanting to provide pilotage service is not plain from the statutory language, and such an interpretation would do Menkes no good, because he specifically does not want to join the SLSPA.

- With respect to pilots' associations, and Great Lakes pilots' associations in particular, in the more than forty years since the GLPA was enacted, persons wanting to join a pilots' association apply to become a member and the pilots' association admits those it chooses to accept and who can

meet the requirements to become a registered, licensed, and qualified pilot.

- Congress intended to regulate pilotage on the Great Lakes and intended to give the Coast Guard authority to delegate to certificated pilots' associations the operation of pilotage pools "to provide for efficient dispatching of vessels and rendering of pilotage services." 46 U.S.C. § 9304. It is the Coast Guard's view that this should include allowing the certificated pilots' associations to decide if they will dispatch non-member pilots. Of course, the certificated pilots' associations' power to operate pilotage pools is always subject to the Director's authority to register Great Lakes pilots, in accordance with 46 C.F.R. Part 401, Subpart B; to set pilotage rates with target compensation based on an assumed reasonable number of pilots to provide adequate pilotage service, in accordance with 46 C.F.R. Part 404; and to generally oversee the provision of pilotage services in accordance with 46 U.S.C. Chapter 93 and 46 C.F.R. Chapter III.

- The agency's authorized delegation of primary responsibility for the operation of pilotage pools to certificated pilots' associations is in the public interest.

- The Coast Guard has no interest in whether Menkes joins the SLSPA or any other pilots' association. That is a matter entirely up to him and to the pilots' association if he wants to apply for membership.

This material is drawn from the *Agency Decision on Remand from the Court of Appeals for the District of Columbia and the District Court for the District of Columbia in the Case of* Richard J. Menkes v. Dep't of Homeland Sec., et al. (June 2, 2008) ("*Agency Decision on Remand*") at 8-16, *reprinted in* J.A. 286-94. [Because it is not otherwise easily accessible online or

elsewhere, a substantial portion of the *Agency Decision on Remand* is reprinted in the Appendix to this opinion.]

The agency also addressed the need for pilots in Area 2 during the 2004 navigation season. Relying on a declaration by Wasserman, the Coast Guard found that

> at the end of the 2003 navigation season, even allowing for a modest increase in bridge hours [the hours a pilot is aboard a vessel providing basic pilotage service] in the 2004 navigation season, there was no reason for Mr. Wasserman to believe that more than four pilots would be needed for the 2004 navigation season in Area 2. Considering that the SLSPA expected to have four pilots available for service in Area 2, it did not appear that there would be a great need for Area 1 pilots to work in Area 2 and that the SLSPA could provide adequate pilotage service without Mr. Menkes being ordered to provide pilotage service [in Area 1].

*Agency Decision on Remand* at 33-34, J.A. 311-12; *see also* Decl. of Paul M. Wasserman (May 28, 2008), J.A. 451-61 (explaining basis for Wasserman's decision to allow Menkes's appointment as independent pilot to expire).

The parties returned to the District Court, where both Menkes and the Government filed new cross-motions for summary judgment. The District Court denied Menkes's motion and granted the Government's. *Menkes III*, 662 F. Supp. 2d 62 (D.D.C. 2009). It first rejected Menkes's argument that he should be allowed to conduct extra-record discovery, holding that Menkes failed to make a sufficient showing that the Coast Guard acted in bad faith. *Id.* at 69-70 & n.5. Second, the court found the Coast Guard's interpretation of the term "voluntary association" both reasonable and consistent with the agency's actions. *Id.* at 70. Third, the court found that, despite Wasserman's and Gilmour's use of the term "extraordinary

circumstance" in their 2003 and 2004 letters, the Coast Guard did not apply an improper standard in determining that the SLSPA likely would have an adequate number of pilots available for the 2004 navigation season. *See id.* at 71. Finally, the court found that it was unreasonable for Menkes to believe that Flyntz's 2001 letter gave him a permanent right to dispatch as an unaffiliated, independent pilot. *Id.* at 71-73.

The District Court also found for the Government with respect to Menkes's constitutional claims. The court held that Menkes's First Amendment claim was precluded by the Second Circuit's decision in *SLSPA*, in which that court rejected Menkes's First Amendment claim against the SLSPA. *Id.* at 73. The District Court also held that Menkes's due process claim under the Fifth Amendment failed because Menkes did not have a protected property interest in serving as a pilot in a specific area of the Great Lakes. *Id.* at 73-74.

Menkes appeals from the District Court's ruling that the Coast Guard's interpretation of the term "voluntary association" was consistent with 46 U.S.C. § 9304. He also appeals from the District Court's disposition of his remaining APA and constitutional claims.

## II. Analysis

### A. *Standard of Review*

Our review of the District Court's grant of summary judgment, including its legal determinations regarding Menkes's First Amendment and due process claims, is *de novo*. *See Howmet Corp. v. EPA*, 614 F.3d 544, 549 (D.C. Cir. 2010). We review the District Court's denial of Menkes's request for additional discovery for an abuse of discretion. *United States v. Deloitte LLP*, 610 F.3d 129, 134 (D.C. Cir. 2010). Within that abuse of discretion standard, however, we review whether the District Court applied the correct legal standard *de novo*. *Id.* Menkes's claim that the Coast Guard's interpretation of

"voluntary association" in 46 U.S.C. § 9304 is at odds with the statute is reviewed under the two-part test enunciated by the Supreme Court in *Chevron*. *See Chevron*, 467 U.S. at 843-44.

As for Menkes's assertion that the Coast Guard violated the APA in its decisionmaking,

> the arbitrary and capricious standard governs review of *all* proceedings that are subject to challenge under the APA. *See Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986). Thus, if an action is subject to review under the APA, it does not matter whether it is a formal or informal adjudication or a formal or informal rulemaking proceeding – all are subject to arbitrary and capricious review under [5 U.S.C.] § 706(2)(A).

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW–REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 167 (2007) (emphasis in original).

> Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**B.** *Statutory Interpretation of "Voluntary Association"*

Menkes does not claim that the Coast Guard violated the APA when it issued the *Agency Decision on Remand* without first engaging in notice-and-comment rulemaking. And for good reason. The Supreme Court has made it clear that "the fact

that [an] Agency . . . reache[s an] interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due." *Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (citation omitted). Menkes's sole objection here is that the Coast Guard's interpretation of the term "voluntary association" in 46 U.S.C. § 9304 is manifestly at odds with the terms of the GLPA and thus arbitrary and capricious under the APA.

In addressing Menkes's claim, we must first determine whether the agency's interpretation of the statute – including its construction of "voluntary association" and its explanation of an association's responsibilities vis-à-vis the Coast Guard and independent pilots – deserves *Chevron* deference. Menkes does not contest the applicability of *Chevron*. Appellant's Br. at 16 ("*Chevron* . . . controls the Court's review of an administrative agency decision."). Nevertheless, in light of the concerns raised by the court in *Menkes II*, 486 F.3d at 1313-14, we are constrained to address the degree of deference due, if any, to the Coast Guard's construction and application of the statute.

Under *Chevron*, if a

> court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or

explicitly, by Congress. If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron*, 467 U.S. at 843-44 (ellipsis in original) (footnotes and quotation omitted). The statute at issue here states that

(a) The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.

(b) For pilotage pools, the Secretary may–

(1) limit the number of the pools;

(2) prescribe regulations for their operation and administration;

(3) prescribe a uniform system of accounts;

(4) perform audits and inspections; and

(5) require coordination on a reciprocal basis with similar pool arrangements authorized by the appropriate agency of Canada.

46 U.S.C. § 9304. The statute does not directly address the precise questions at issue in this case. However, there is no doubt that the statute provides an "express delegation of

authority to the agency to elucidate" the terms of § 9304. It is also clear that the Coast Guard acted pursuant to this congressionally delegated authority in adopting regulations governing pilotage on the Great Lakes and in amplifying its interpretation of the statute in its *Agency Decision on Remand*. Therefore, the Secretary's regulations and the *Agency Decision on Remand* are "legislative regulations [that must be] given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."

It does not matter that the *Agency Decision on Remand* – in which the Coast Guard amplified its position on the meaning of "voluntary associations" and explained the rights of unaffiliated, independent pilots – is a judgment rendered in an adjudication rather than in a rulemaking procedure.

> The Supreme Court has explained that [*Chevron*] Step Two deference . . . comes into play when an agency has acted within the area in which Congress has authorized it to act, and the action at issue was taken pursuant to congressionally delegated authority to make law and with the intent on the part of the agency to act with the force of law. [*United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)]. As *Mead* explains, "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id.* at 230. The absence of rulemaking or adjudicatory procedures is not dispositive, however, for the Court has "sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded." *Id.* at 231.

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW–REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 152 (2007).

Menkes's arguments fall far short of showing that the Coast Guard's interpretation of 46 U.S.C. § 9304 is manifestly contrary to the statute or otherwise arbitrary and capricious. First, the Coast Guard was acting pursuant to an express delegation from Congress. The GLPA specifically allows the Coast Guard to "authorize the formation of a pool by a voluntary association of United States registered pilots." 46 U.S.C. § 9304. And the statutory mandate gives the Coast Guard the explicit authority to set parameters for voluntary associations. *See id.* § 9304(b).

Second, the Coast Guard's *Agency Decision on Remand* addresses interstitial questions, *see Walton*, 535 U.S. at 222, that are bound up with the administration of the Coast Guard's scheme of regulating pilotage on the Great Lakes. If the Coast Guard had adopted Menkes's proposal that independent pilots must be dispatched on equal terms with members of voluntary associations, this could have incentivized other member pilots – like Menkes – to resign their association membership because they could receive the benefit of being dispatched without the burden of paying for an equity stake in a voluntary association. *See* Letter from Richard J. Menkes to Paul M. Wasserman, Acting Director of Great Lakes Pilotage (July 8, 2003), *reprinted in* J.A. 98 (explaining Menkes's position that "[i]f five pilots are called for in the rates, I would be entitled to one fifth of all U.S. dispatches; if the number of pilots called for is six, then I would get one sixth of all U.S. dispatches, and so on"). This could have impacted myriad aspects of the regulatory scheme, 46 C.F.R. § 401.300 *et seq.*, including the Coast Guard's discretion to "determine[ ] that a pool is necessary for the efficient dispatching of vessels and the providing of pilotage services in the area concerned," *id.* § 401.320(a). After all, if an association had to dispatch every willing, non-member registered pilot, this could affect the Coast Guard's calculus of whether the formation of a pool in a particular district would be efficient. In sum, the potential ramifications of the agency's

decision confirm that these are precisely the sort of complex, interstitial questions that the Coast Guard deserves deference to address. *See Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) (according *Chevron* deference to FDA letter due to "complexity of the statutory regime under which the FDA operates, the FDA's expertise [and] the careful craft of the scheme it devised to reconcile the various statutory provisions").

Furthermore, the Coast Guard's interpretation, as clarified in the *Agency Decision On Remand,* reflects a longstanding agency policy. The Coast Guard explained that the policy dates back to around 1975, *Agency Decision on Remand* at 9, J.A. 287, and Menkes has provided no evidence to the contrary. In fact, in a letter sent by Menkes *in 1978*, he acknowledged that

> [i]t is my understanding that the Great Lakes Pilotage System allowed only licensed pilots who were members of the designated pilot association . . . to operate vessels unless an appropriate waiver has been obtained for such pilotage. Even waivers, to the best of my knowledge, do not allow pilots who were former members of the association without any affiliation, to pilot vessels in the Great Lakes System.

Letter from Richard J. Menkes to George R. Skuggen, Director, Great Lakes Pilotage Staff (Mar. 27, 1978), *reprinted in* J.A. 144. Although, as noted above, F.J. Flyntz arguably voiced a different view in his 2001 letter authorizing Menkes to be dispatched, Flyntz's determination was appealed by the SLSPA. On appeal, Flyntz's disputed decision was modified by his superior, J.P. High, the Coast Guard's Director of Waterways Management, who upheld the decision solely on the ground that Menkes could be dispatched because the SLSPA was not providing adequate pilotage service. *See* Letter from J.P. High, Director of Waterways Mgmt., to Mark Ruge, Preston, Gates, Ellis & Rouvelas, Meeds LLP at 2-3 (May 22, 2001), J.A. 126-27. High did not adopt Flyntz's interpretation of the GLPA.

Because High's construction of the statute displaced Flyntz's, it is evident that Flyntz's interpretation was never controlling.

It is highly significant here that the agency's "interpretation is one of long standing." *Walton*, 535 U.S. at 221. And it does not matter that the Coast Guard "reached its interpretation through means less formal than 'notice and comment' rulemaking," *id.*, especially when Menkes has not challenged the method used by the agency to amplify its regulations. *Benkelman Tel. Co. v. FCC*, 220 F.3d 601, 607 n.10 (D.C. Cir. 2000) (finding argument that agency violated APA by failing to utilize notice-and-comment rulemaking waived).

Surely, the Coast Guard's enunciation of the aforecited statutory interpretations and rules has the "force of law," *Mead*, 533 U.S. at 232, especially given the instruction from this court to the agency to "come to grips with the meaning of the statute." *Menkes II*, 486 F.3d at 1314. The court's remand order did not instruct the agency to conduct notice-and-comment rulemaking or a formal adjudication, nor did Menkes request either procedure. In these circumstances, we think it is clear under *Mead* and *Walton* that *Chevron* applies. And not only does the deferential *Chevron* framework apply to the Coast Guard's interpretation of 46 U.S.C. § 9304, but, to the extent that the Coast Guard's *Agency Decision on Remand* reflects the agency's interpretation of its own regulations – here, 46 C.F.R §§ 401.300, 401.720(b) – it deserves even greater deference. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also Chase Bank USA, N.A. v. McCoy*, 131 S.Ct. 871, 880-82 (2011) (deferring to agency's interpretation of its own regulation, advanced in legal brief, because "the interpretation . . . is consistent with the regulatory text").

Applying the *Chevron* framework, we conclude that the Coast Guard's policy is easily upheld. *Chevron* Step One requires that we "examine[] the statute *de novo* in order to determine 'whether Congress has directly spoken to the precise

question at issue.'" *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 550 (D.C. Cir. 2009) (quoting *Chevron*, 467 U.S. at 842). It is not clear from the text of 46 U.S.C. § 9304 whether a voluntary association can decide to dispatch only its members, for the term "voluntary association" is undefined. Nor are there any hints in the GLPA's limited legislative history as to how Congress wished to resolve this question. *See* H.R. REP. NO. 86-1666 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2481. Congress thus did not definitively answer the question at issue. Menkes's argument that an association cannot be "voluntary" if membership is a necessary precondition for employment is a non-sequitur.

Moving on to *Chevron* Step Two, we are obliged to defer to the agency's interpretation if it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *see also NetCoalition v. SEC*, 615 F.3d 525, 533 (D.C. Cir. 2010) (noting that "we accept the agency's interpretation of the statute as long as it is reasonable"). The Coast Guard contends that its position is in furtherance of the public interest because

> it removes the Director [of Great Lakes Pilotage] from day to day involvement in the operation of the pilotage pools and allows him to focus on oversight of the Great Lakes pilotage operations. It also allows the pilots' associations that traditionally have brought organization and efficiency to the provision of pilotage service to apply their expertise to the operation of the pool. And it promotes the availability of the necessary infrastructure for safe and efficient pilotage – such as pilot boats, and office functions including billing. It promotes retention of pilots, by giving the pilots in the association some control over decisions that will affect the financial health of the pilots, the pilots' association and other entities that may provide infrastructure support to the pilots.

*Agency Decision on Remand* at 15, J.A. 293. These justifications are reasonable, and Menkes does not question them.

In sum, we have no trouble concluding that the Coast Guard's interpretations of the statute and its implementing regulations are neither manifestly contrary to the statute nor arbitrary and capricious.

## C. *First Amendment*

Menkes also argues that the Coast Guard violated his First Amendment right of association by requiring him to become a member of the SLSPA in order to be dispatched as a pilot in District One. It appears that this claim is precluded because the Second Circuit decided this issue against Menkes in *SLSPA*, a case in which Menkes brought suit against the SLSPA alleging, *inter alia*, that the SLSPA violated Menkes's First Amendment right of association.

This case involves defensive, non-mutual issue preclusion, because the Government – the party seeking to invoke preclusion – was not a party to the Second Circuit action. Issue preclusion applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). Preclusion also must "not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). In addition, "issue preclusion does not require mutuality of parties." *Gov't of Rwanda v. Johnson*, 409 F.3d 368, 374 (D.C. Cir. 2005) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971)).

The First Amendment issue pressed by Menkes here is identical to the one decided by the Second Circuit: whether requiring membership in the SLSPA as a condition of being dispatched by the Association as a District One pilot violated

Menkes's First Amendment rights.  *See Menkes v. SLSPA*, No. 06-CV-339, 2007 WL 167715 at *10 (N.D.N.Y. Jan. 18, 2007) (citing Menkes's complaint).  The Second Circuit decided this issue against Menkes on the merits, citing the Supreme Court's decision in *Keller v. State Bar of California*, 496 U.S. 1, 8 (1990), to support the proposition that "the government can compel an individual to join a professional association as a condition of employment."  *SLSPA*, 269 F. App'x at 56.  Because the Second Circuit's disposition of Menkes's First Amendment claim was final and essential to the Second Circuit's judgment dismissing his complaint, and neither in his briefs nor at oral argument did Menkes provide a plausible explanation as to why preclusion would be unfair, preclusion is appropriate.

Even if Menkes's First Amendment claim were not precluded, it would fail on the merits.  Menkes argues that *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), prevents the government from enabling a private association to require membership as a condition of employment.  *Abood*, in fact, refutes Menkes's argument.  In *Abood*, the Court upheld a Michigan statute that permitted a union and a local government employer to enter into an "agency shop" agreement, whereby non-union members had to pay the union the equivalent of union dues as a condition of employment.  The Court noted that "[t]o compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests."  *Id.* at 222.  Nonetheless, it found the "agency shop" agreement constitutionally justified by Congress's assessment of the important contribution of these types of arrangements to the system of labor relations.  *Id.*  It follows from *Abood* that here, even if the Coast Guard's interpretation of the term "voluntary association" in 46 U.S.C. § 9304 does impinge on Menkes's First Amendment rights, any such interference is justified by the government's interest in regulating pilotage on the Great Lakes.

The legislative history of the GLPA indicates the factors at issue in regulating Great Lakes pilotage – including the need for maritime safety, the need for coordination between the United States and Canada, and Congress's push for the equitable participation of American nationals in Great Lakes pilotage. H.R. REP. NO. 86-1666, at 3-4 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2481, 2483-84. By giving voluntary associations the discretion to dispatch members, the Coast Guard is acting in furtherance of these legitimate interests. *See Agency Decision on Remand* at 15, J.A. 293 (explaining why the Coast Guard's policy is in the public interest). These interests are sufficient to satisfy *Abood. See also Keller,* 496 U.S. at 13-14 (holding that "compelled association" of state bar was justified by the "State's interest in regulating the legal profession and improving the quality of legal services"); *Ry. Emps.' Dep't, Am. Fed. of Labor v. Hanson*, 351 U.S. 225, 238 (1956) (holding that provision of Railway Labor Act permitting a "union shop" clause, whereby every employee is obliged to pay union dues, did not violate First Amendment).

Menkes has not raised, and we need not address, whether a Coast Guard-designated pilots' association could arbitrarily reject an applicant for membership in that association, or whether an association could refuse to dispatch a registered non-member willing to pay *all* costs of membership, including the equity stake, and assume all responsibilities shared by association members. Here, although Menkes was willing to reimburse the SLSPA for expenses that the Association incurred on his behalf, he did not offer to purchase the equity stake, worth approximately $60,000, that members are required to purchase. Reply Br. at 9. Although Menkes cursorily alleges the SLSPA "engages in legislative and lobbying activities," Appellant's Br. at 4, he does not allege that the SLSPA used, or threatened to use, any of his funds for political or ideological activities unrelated to pilotage, which could run afoul of *Abood*, 431 U.S. at 236. *See also Int'l Ass'n of Machinists v. Street*, 367

U.S. 740 (1961) (construing Railway Labor Act to avoid constitutional question of whether union could spend employee's dues for political causes that employee opposes).

Finally, Menkes's reliance on *NLRB v. General Motors Corp.*, 373 U.S. 734 (1963), and *Local 357, International Brotherhood of Teamsters v. NLRB*, 365 U.S. 667 (1961), is entirely misplaced.  These cases involved the legality of an agency shop agreement and a hiring hall arrangement under the National Labor Relations Act.  Neither decision addressed the First Amendment.

**D.** ***The Coast Guard's Decision That Menkes's Appointment as an Independent Pilot Expired After the 2003 Season***

Menkes proffers a hodgepodge of arguments for why the Coast Guard's decision not to dispatch him as an independent pilot during the 2004 season was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).  None of these arguments carry the day.

### *1. Wasserman's Declaration*

Menkes first focuses on the statement in Wasserman's declaration, which was offered to supplement the administrative record pursuant to our remand in *Menkes II*, that

> [i]n letters dated November 5, 2003, and December 15, 2003, and in informal communications that continued through March of 2004, the SLSPA . . . convinced me that the pilots' association really would be able to resolve the attrition issue in Area 2 and have an adequate number of pilots there during the 2004 navigation season.

Decl. of Paul M. Wasserman ¶ 16 (May 28, 2008), *reprinted in* J.A. 459.  Menkes contends that the SLSPA's November 5 and December 15 letters do not support a conclusion that the SLSPA had cured its performance problems with respect to Area 2.  We disagree.  The letters clearly provide support for the view that

the SLSPA had not been responsible for the problem of pilot attrition in Area 2. To the extent that the attrition problem was attributable to the Association, the December 15 letter notes the Association's "recent recruitment and training successes" and sets forth proposed modifications to the pay structure for pilots-in-training intended to forestall discontent of new members. Letter from Roger S. Paulus, President, to Paul M. Wasserman, Acting Director, Great Lakes Pilotage at 2 (Dec. 15, 2003), *reprinted in* J.A. 82. In light of these letters, it was reasonable for Wasserman to conclude that the Association deserved a chance to provide adequate pilotage service for the 2004 season.

Menkes also argues that the Coast Guard's decision was arbitrary and capricious, because Wasserman's reliance on "informal communications" does not reveal either the facts upon which he relied or his sources of information. While it is true that the record does not contain a log of each communication between the SLSPA and Wasserman in 2003, Wasserman's declaration does provide a detailed explanation of the reasons justifying Wasserman's belief that the SLSPA likely would be able to provide adequate pilotage service in the 2004 season. Wasserman concluded that no more than six pilots would be necessary to provide adequate pilotage service in Area 1 and that the SLSPA had seven of its own pilots qualified for the area, making Menkes's services unnecessary. Decl. of Paul M. Wasserman ¶¶ 13-19 (May 28, 2008), J.A. 457-61. Menkes offers nothing to suggest that these calculations were in error or a fabrication.

Reading Wasserman's reference to "informal communications" in context, it is evident that the informal communications provided factual support for the information and calculations that led Wasserman to conclude that the SLSPA could dispatch a sufficient number of its own pilots to provide adequate pilotage service in 2004. *E.g.*, *id.* ¶ 17, J.A. 460 ("[B]y the end of December, 2003, the SLSPA had verbally requested,

and I had verbally approved, authority to open a pilot selection process to hire additional [Area 2] pilots in time for the 2004 season."). In fact, Menkes himself wrote the Coast Guard complaining of a surplus of pilots during the 2003 navigation season. Letter from Richard J. Menkes to Paul M. Wasserman, Acting Director of Great Lakes Pilotage (July 8, 2003), *reprinted in* J.A. 98 ("At the present time [the SLSPA] employ[s] too many pilots for the amount of traffic using the Seaway, and this year is proving to be one of the slowest navigation seasons on record.").

At bottom, Menkes argues that the Coast Guard's decision is arbitrary and capricious because it fails to record each of the agency's informal communications with the SLSPA. We decline to adopt such a rigid rule. *See Menkes II*, 486 F.3d at 1314 ("[T]his was an informal adjudication, and it is common for the record to be spare in such cases."); *see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Here, it is clear that Wasserman had communicated with the SLSPA in 2003 and, as a result, became convinced of the merits of the Association's plan to provide adequate pilotage service for all of District One during the 2004 season. Wasserman explained the basis of his decision through his on-the-record declaration, and that explanation is sufficient to survive arbitrary-and-capricious review.

Menkes also argues that Wasserman could not have written his December 29, 2003 letter terminating Menkes's appointment based on communications "that continued through March of 2004," Decl. of Paul M. Wasserman ¶ 16 (May 28, 2008), J.A. 459. Although that is obviously true, the mere fact that Wasserman continued to communicate with the SLSPA in early 2004 about this issue does not indicate that Wasserman had no rational basis for his December 2003 decision to let Menkes's

appointment expire. Indeed, Wasserman's behavior was consistent with the statement in his December 2003 letter to Menkes and the SLSPA that he would "continue to monitor the status of the SLSPA after the 2003 navigation season to determine whether the services of any independent pilots will be required for the 2004 navigation season." Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Roger Paulus & Richard Menkes at 2 (Dec. 29, 2003), J.A. 77.

Menkes also contends that Wasserman's declaration is an impermissible *post hoc* rationalization for the Coast Guard's action. This argument is meritless. Wasserman's declaration was presented in response to this court's direction to the Coast Guard to offer an "explanation regarding the changed conditions from the 2003 to 2004 navigation season" on remand. *Menkes II*, 486 F.3d at 1314. "Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006). As we noted in *Local 814, International Brotherhood of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) (per curiam):

> The "*post hoc* rationalization" rule is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers.

Because Wasserman is a "proper decisionmaker," his declaration – which explains why the agency allowed Menkes's appointment to lapse in 2003 – is not an impermissible *post hoc* rationalization.

### *2. "Extraordinary Circumstance" Standard*

Menkes goes on to argue that the Coast Guard's position that unaffiliated, independent pilots could only be dispatched in the event of an "extraordinary circumstance" is a stricter standard than the regulatory requirement of a "physical or economic inability to [provide service]," 46 C.F.R. § 401.720(b), and that the Coast Guard originally used the "extraordinary circumstance" standard to allow Menkes's appointment as an independent pilot to expire. This issue was highlighted in *Menkes II*. We noted that Wasserman's use of the phrase "extraordinary circumstances" in his January 22, 2004 letter "seems to be an unexplained, stricter threshold for the appointment of nonmember pilots than the regulation's text contemplates." 486 F.3d at 1314. In its decision on remand, however, the Coast Guard clarified that "[t]he phrase 'extraordinary circumstance' was only used as a way to describe the inability of the pilots' association to provide pilotage service." *Agency Decision on Remand* at 22, J.A. 300. The viability of the Coast Guard's explanation is confirmed by Gilmour's 2004 letter denying Menkes's appeal, which made clear that the "extraordinary circumstance" to which Wasserman had referred in his December 2003 letter was the "determination that the SLSPA could not physically provide adequate pilotage service and there was a serious need for additional qualified pilots in District One." Gilmour Letter at 1, J.A. 68. Consequently, contrary to Menkes's claims, the Coast Guard did not "repudiate[ ] its position," Appellant's Br. at 22, and did not act arbitrarily and capriciously in straying from the standard set forth in 46 C.F.R. § 401.720(b).

### *3. Specific Comparisons*

Finally, Menkes argues that the Coast Guard did not comply with this court's instruction in *Menkes II* to provide "specific comparisons" explaining why the Coast Guard's view of the

adequacy of the supply of pilots changed in 2004. *Menkes II*, 486 F.3d at 1314 n.6. This claim also has no merit.

In his declaration, Wasserman explained that

[b]y December 22, 2003, at the end of the navigation season, there was one pilot remaining in Area 2 who was qualified to take vessels into the major ports on the Lake and there was one new pilot who would, shortly following the beginning of the 2004 season, be able to take vessels pilot boat to pilot boat. In addition, by the end of December, 2003, the SLSPA had verbally requested, and I had verbally approved, authority to open a pilot selection process to hire additional Lake pilots in time for the 2004 season.

*Id.* ¶ 17, J.A. 459-60. We can find no infirmity in the agency's explanation, and Menkes offers nothing to convince us that the Coast Guard failed to comply with the court's mandate in *Menkes II.*

### E. *Fifth Amendment*

Menkes argues that the Coast Guard violated his Fifth Amendment due process right to a hearing when it decided that his appointment as an unaffiliated, independent pilot had expired. We find no merit in this claim.

A person cannot have a protected entitlement "if government officials may grant or deny [the benefit] in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). 46 C.F.R. § 401.720(b) permits the Coast Guard to order an unaffiliated, independent pilot to provide pilotage service if a designated voluntary association cannot provide such service due to a "physical or economic inability to do so." This is a discretionary standard, and whether the SLSPA is able to provide adequate pilotage service is wholly out of Menkes's control. *See Glatt v. Chicago Park Dist.*, 87 F.3d 190 (7th Cir.

1996) (holding that yacht owner did not have entitlement to particular slip in harbor, when Marine Director could change assigned slip on grounds of "efficiency" or to address other circumstances). Although Menkes benefitted from SLSPA's inability to provide adequate pilotage service from 2001 through 2003, that, by itself, did not create a constitutionally protected right to continued dispatch absent a "legitimate claim of entitlement," *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Menkes's contention that Flyntz's 2001 letter bolstered his entitlement to continued dispatch is simply mistaken. As the District Court pointed out:

> Flyntz's statements did not represent Coast Guard policy. Furthermore, even assuming Flyntz's statements were authoritative, the statement at best created a property interest in Menkes's *certificate of registration* [as a United States pilot], not in his continued appointment. The Coast Guard's decision only affects his ability to be dispatched in a specific area of the Great Lakes. It has no effect on his certificate of registration. Thus, even if Menkes has a property interest in his certificate of registration, he does not have a property interest in in [sic] serving as a pilot in a specific area.

*Menkes III*, 662 F. Supp. 2d at 74 (emphasis in original).

Even if Menkes did have a protected entitlement in being dispatched as an independent pilot, he received all the process that he was due under the Fifth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). Menkes had multiple opportunities to be heard by the Coast Guard on the issues that he has raised. For example, in January 2004, after Wasserman made his initial determination, Menkes appealed to Gilmour and explained why he believed that Wasserman had erred. Letter from Edward M. Gleason to Thomas Gilmour, Assistant Commander for Marine Safety (Jan. 28, 2004), *reprinted in* J.A.

52-54. Then, in 2007, after this court instructed the District Court to remand Menkes's APA claims to the Coast Guard, the Coast Guard specifically "invite[d] Mr. Menkes to submit any evidence or arguments he would like the Coast Guard to consider." Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Jonathan G. Axelrod, Benis[sic], Axelrod & Kraft, P.C. at 1 (Aug. 9, 2007), J.A. 317. Menkes made such a submission to the agency, to which the Coast Guard directly responded. *Agency Decision on Remand* at 35-37, J.A. 313-15. Thus, even if Menkes's alleged right to dispatch was safeguarded by procedural due process rights, he received all the process that he was due because he had ample opportunity to apprise the Coast Guard of his views. *See Dr Pepper/Seven-Up Cos. v. FTC*, 991 F.2d 859, 863 (D.C. Cir. 1993) ("Assuming, *arguendo*, that [appellant] had a constitutionally protected interest at stake, we would nonetheless conclude that it was adequately protected by the informal procedures provided."); *see also Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6-7 (D.C. Cir. 1998) (notice and informal hearing sufficient to satisfy due process).

## F. *Request for Extra-Record Discovery*

Finally, Menkes argues that the District Court erroneously denied his request to take discovery pertaining to Wasserman's "informal communications" with the SLSPA. We disagree. The District Court applied the proper legal standard and did not abuse its discretion in denying Menkes's request. In agency cases, limited extra-record discovery is only appropriate "when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review." *Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 230 (D.C. Cir. 2009) (quoting *Commercial Drapery*, 133 F.3d at 7). We can find no reason to question the District Court's determination that Menkes "failed

to make a sufficient showing the agency acted in bad faith." *Menkes III*, 662 F. Supp. 2d at 69.

### III. CONCLUSION

For the reasons indicated in the foregoing opinion, the judgment of the District Court is affirmed.

**APPENDIX**

**excerpts from**

*Agency Decision on Remand*

June 2, 2008

. . . .

The Coast Guard agrees with Mr. Menkes that certificated pilots' associations may dispatch non-member pilots and that such pilots' associations have in fact done so. However, the Coast Guard does not agree that the statutes governing Great Lakes pilotage or the implementing Coast Guard regulations require certificated pilots' associations to dispatch every registered, licensed and qualified pilot who desires to provide pilotage services. It is the Coast Guard's position that certificated pilots' associations are primarily responsible for providing adequate pilotage services, and that includes deciding whether or not to dispatch non-member pilots. . . . [O]nly when a certificated pilots' association is not providing adequate pilotage service would the Director deviate from the policy of placing primary responsibility for providing pilotage service with the certificated pilots' association and intervene to ensure that adequate pilotage service is provided or notify vessels that a pilot is not available. This is a longstanding policy based in part on the Coast Guard's interpretation of the Great Lakes Pilotage regulations, dating at least back to about 1975.

. . . .

The Coast Guard's authority to authorize certificated pilots' associations is found in 46 U.S.C. § 9304, which states: "The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services." Coast Guard regulations implementing that provision are found in 46 C.F.R. Part 401, Subpart C. The regulations

contain qualifications and requirements for formation of a pool by a certified pilots' association, at 46 C.F.R. § 401.320, including, among other requirements, that the pilots' association agree to provide pilots to vessels on a first-come, first served basis. Significantly, that regulation does not require the pilotage association to agree to dispatch or admit to the pool every registered, licensed and qualified pilot who desires to provide pilotage service.

The regulations also provide at 46 C.F.R. § 401.340 for the dispatching of non-member pilots. The regulation states in part: "[f]acilities and service of the pool may be denied to any U.S. Registered Pilot who fails or refuses to execute [authorizations relating to billing for services and compliance with work rules, among other things]. While the regulation specifically grants the pilots' association authority to deny the facilities and services of the pool to pilots refusing to agree to important terms for participation in the pool, it does not explicitly address whether a pilots' association must otherwise make the facilities and services of the pool available to non-member pilots. The Coast Guard does not interpret this provision as requiring the provision of the facilities and services of the pool to every pilot willing to make the required authorizations or to require the pilots' association to dispatch every such pilot.

The Coast Guard also does not interpret the phrase "voluntary association" found in 46 U.S.C. § 9304, and in the Coast Guard's implementing regulations to mean that a certified pilots' association must dispatch every registered, licensed and qualified pilot who desires to provide pilotage service. Mr. Flyntz's letter of March 7, 2001, J.A. 120-21, to Captain Paulus of the SLSPA contains language emphasizing the word "voluntary" in 46 U.S.C. § 9304 and suggesting that the SLSPA and the Coast Guard had to allow Mr. Menkes to continue providing pilotage service after he left the SLSPA.

. . . .

It is the Coast Guard's position that any such language in Mr. Flyntz's letter was never an authoritative statement of the agency's interpretation of the phrase "voluntary association." Moreover, even if it was, it was an aberration from the Coast Guard's consistent position in more than forty years of regulating Great Lakes pilotage, and it was quickly superseded by the final agency action of Mr. High, in his letter dated May 22, 2001, J.A. 114-16, following the SLSPA's appeal of Mr. Flyntz's letter. Mr. High's letter did not endorse Mr. Flyntz's novel interpretation of the phrase "voluntary association," instead basing the denial of the SLSPA's appeal on the authority of the Director to order a pilot to provide pilotage service in accordance with 46 C.F.R. § 401.720(b).

. . . .

As a matter of statutory interpretation, it seems that if Congress had intended 46 U.S.C. § 9304 to have the meaning that Mr. Menkes asserts, it would have used the word "voluntary" with "pool" to indicate that the pool should be open to anyone wanting to provide pilotage service although, even in that case, the intent of the phrase would not be plain. But as it is, Congress used the phrase "voluntary association." Interpreting the word voluntary to mean that the association should be open to anyone wanting to provide pilotage service is again not plain from the statutory language, and such an interpretation would do Mr. Menkes no good, because he specifically does not want to join the SLSPA.

Since Congress has not provided a specific meaning or definition for the phrase "voluntary association," the Coast Guard may interpret the phrase and give it a meaning that is reasonable and consistent with the purpose of 46 U.S.C. § 9304 and 46 U.S.C. Chapter 93 as a whole. Naturally, we start with the plain meaning to the extent one can be ascertained. American Jurisprudence 2d, Volume 6, has a Title called "Associations and Clubs." Section 1 of that title defines kinds

of associations. It explains that an association is a collection of persons joined together for a certain object, and that any unincorporated association is not a legal entity distinct from the persons who are members. 6 Am Jur 2d, Associations and Clubs §1. This section goes on to say:

> The term 'voluntary' is frequently used in connection with the term 'association' or 'society,' and some principles of law are confined, in their operation, to 'voluntary' organizations. In this connection, the term means simply that the organization is one in which one may seek, or be accepted into, membership in the organization as a matter of choice.

6 Am Jur 2d, Associations of Clubs §1.

With respect to pilots' associations, and Great Lakes pilots' associations in particular, in the more than forty years since the Great Lakes Pilotage Act of 1960 was enacted, persons wanting to join a pilots' association apply to become a member and the pilots' association admits those it chooses to accept and who can meet the requirements to become a registered, licensed and qualified pilot.

With repsect to membership of voluntary associations, American Jurisprudence states:

> Membership in a voluntary unincorporated association is generally held to be a privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced.

6 Am Jur 2d, Association and Clubs § 18.

It is the Coast Guard's position that Congress used the phrase "voluntary association" only in the sense suggested by the above mentioned language from American Jurisprudence 2d – i.e., a collection of persons joined together for a certain purpose, and not a legal entity distinct from the persons who are

members. The Coast Guard considers this to be a reasonable interpretation of the phrase as it is used in 46 U.S.C. § 9304, and that this meaning is consistent with the purpose of that provision and 46 U.S.C. Chapter 93 as a whole.

. . . .

With respect to Great Lakes pilotage, the Coast Guard understands that Congress intended to regulate pilotage on the Great Lakes and intended to give the Coast Guard authority to delegate to certificated pilots' associations the operation of pilotage pools "to provide for efficient dispatching of vessels and rendering of pilotage services." 46 U.S.C. § 9304. It is the Coast Guard's view that this should include allowing the certificated pilots' associations to decide if they will dispatch non-member pilots. Of course, the certificated pilots' associations' power to operate pilotage pools is always subject to the Director's authority to register Great Lakes pilots, in accordance with 46 C.F.R. Part 401, Subpart B; to set pilotage rates with target compensation based on an assumed reasonable number of pilots to provide adequate pilotage service, in accordance with 46 C.F.R. Part 404; and, to generally oversee the provision of pilotage services, in accordance with 46 U.S.C. Chapter 93 and 46 C.F.R. Chapter III.

. . . .

The Coast Guard has determined that Congress intended to allow the agency to delegate primary responsibility for the operation of pilotage pools to certificated pilots' associations, and that delegating that responsibility is in the public interest. That responsibility includes deciding whether or not to dispatch non-member pilots. Delegating responsibility to the certificated pilots' associations is in the public interest because it removes the Director from day to day involvement in the operation of the pilotage pools and allows him to focus on oversight of the Great Lakes pilotage operations. It also allows the pilots' associations

that traditionally have brought organization and efficiency to the provision of pilotage service to apply their expertise to the operation of the pool. And it promotes the availability of the necessary infrastructure for safe and efficient pilotage – such as pilot boats, and office functions including billing. It promotes retention of pilots, by giving the pilots in the association some control over decisions that will affect the financial health of the pilots, the pilots' association and other entities that may provide infrastructure support to the pilots.

. . . .

Finally, to be very clear, the Coast Guard has no interest in whether Mr. Menkes joins the SLSPA or any other pilots' association. That is a matter entirely up to him and to the pilots' association if he wants to apply for membership. Additionally, it is not the position of the Coast Guard that Mr. Menkes must join a pilots' association if he wants to provide pilotage service. The Coast Guard agrees with Mr. Menkes that under the applicable statutes and regulations the certified pilots' associations may dispatch non-member pilots who are registered, licensed and qualified to provide pilotage service. However, the Coast Guard does not agree that the certified pilots' associations have to dispatch non-member pilots. The certified pilots' associations are primarily responsible for operation of the pilotage pool, and they may decide whether or not to dispatch non-member pilots.

*Agency Decision on Remand from the Court of Appeals for the District of Columbia and the District Court for the District of Columbia in the Case of* Richard J. Menkes v. Dep't of Homeland Sec., et al. (June 2, 2008) at 8-16, *reprinted in* J.A. 286-94.

BROWN, *Circuit Judge*, dissenting in part:

This is not an easy case. The court recognized as much before our initial remand, acknowledging "[t]he statutory question is potentially a difficult one," and urging the Coast Guard to provide a "forthright agency interpretation." *Menkes v. Dep't of Homeland Sec.* ("*Menkes II*"), 486 F.3d 1307, 1313–14 (D.C. Cir. 2007). The Coast Guard did not heed our advice. The process the Coast Guard instituted on remand, as well as the agency's proffered interpretation of the relevant statute and/or its own regulations still provides little light for those lost at sea.

Neither the Coast Guard's *Agency Decision on Remand* nor the court's opinion identifies precisely what is being interpreted: the statute, the Great Lakes Pilotage Act ("GLPA"), or the agency regulations. The *Agency Decision on Remand* focuses on the Coast Guard's regulations, 46 C.F.R. §§ 401.320 and 401.340. But at the same time, the *Agency Decision on Remand* purports to define the term "voluntary association"—a phrase that appears only in the statute. The court's opinion, by comparison, suggests the question is one of "statutory interpretation" and that "we are constrained to address . . . the Coast Guard's construction and application of the statute." Maj. Op. 17. Yet the court focuses on the Coast Guard's regulations and their animating policies—not the statute—when justifying the deference it gives and the reasonableness of the agency's "statutory" construction. Maj. Op. 21, 23.

Different interpretive processes implicate different levels of deference, and ultimately this case is about deference—whether it is owed, and if so, how it would be applied. Whether the Coast Guard is interpreting the statute or its own regulations, however, its interpretation stems from an informal adjudication. As a result, the path to deference is not as simple as the court makes it seem. If this is an agency

regulation case, our precedent requires notice and comment when modifying an interpretation of an agency regulation—a process the Coast Guard did not institute on remand. If this is a statutory interpretation case, the minimum safeguards required by the Administrative Procedures Act ("APA") are necessary—procedures the Coast Guard also did not implement on remand. Either way, the agency is not entitled to the reflexive and uncritical sort of deference the court gives here.

At bottom, the Coast Guard argues allowing the SLSPA to compel membership and screen pilots before dispatching them to work on the Great Lakes is consistent with the term "voluntary." Even assuming deference is owed, this statutory gloss—framed as an interpretation of the agency's own regulations or as an interpretation of the statute itself—seems both dubious and pernicious. Therefore, I dissent.[1]

I

Although an agency is "entitled to significant deference in interpreting its own regulation—perhaps even more than an agency gets in interpreting a statute under *Chevron*"—it is unlikely we would defer to an unreasonable agency interpretation of an ambiguous regulation. *Kidd Commc'ns v. FCC*, 427 F.3d 1, 4 (D.C. Cir. 2005); *see Paralyzed Veterans of Am. v. D.C. Arena, L.P.*,117 F.3d 579, 584 (D.C. Cir. 1997) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also* HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL COURTS STANDARDS OF REVIEW: APPELLATE COURT REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 165 (2007). An agency may tweak its interpretation either through general rulemaking or by adjudication. *See*

---

[1] I dissent only from the court's resolution of Menkes's APA claim.

*SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947). But, once an agency gives its regulation a definitive interpretation, "'it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.'" *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999) (quoting *Paralyzed Veterans*, 117 F.3d at 586). An agency has less flexibility in "changing its interpretation of its regulations than in altering its construction of a statute" because the APA defines "rulemaking" to include "not only the agency's process of formulating a rule, but also the agency's process of modifying a rule." *Id*. (citing 5 U.S.C. § 551(5)).

The Coast Guard's first interpretive effort was put forward by Director Flyntz in the 2001 informal adjudication that set the present controversy in motion. *See Chenery*, 332 U.S. at 202 (stating an agency may promulgate regulatory "rules" by "individual order," *i.e.* in an informal adjudication). We summarized Mr. Flyntz' position in *Menkes II*: "Flyntz stated that 'Captain Menkes will continue to serve as a pilot on the St. Lawrence River tour-de-role,' and that he would 'be available for dispatch whether or not he belongs to a pilotage pool.'" 486 F.3d at 1309 (quoting Letter from F.J. Flyntz, Director, Great Lakes Pilotage to Roger Paulus, President, SLSPA at 1 (Mar. 7, 2001) [hereinafter Flyntz March Letter], *reprinted in* J.A. 131). Flyntz emphasized that "'[a] pilotage pool is a *voluntary* association of registered pilots,' (citing 46 U.S.C. § 9304), and that '[t]here is no mandatory requirement in statute or regulation that requires Great Lakes registered pilots to belong to a pool in order to provide pilotage service.'" *Id.* (alterations in original). Flyntz specifically noted: "resignation from the Association does not . . . provide any basis for the Coast Guard *to deny him the opportunity to continue to earn his*

*livelihood as a U.S. registered pilot.*" *Id.* (alteration in original).[2]

Yet in 2003, Paul Wasserman, the newly appointed Director, presented a different view. *See* Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Roger Paulus & Richard Menkes at 2 (Dec. 29, 2003) [hereinafter Wasserman December Letter], *reprinted in* J.A. 76. Mr. Wasserman (and Commandant Gilmour who affirmed Wasserman's informal adjudication when the SLSPA challenged it) read § 401.720(b) as creating a preference for the Association so long as the Association has the physical and economic ability to meet demand. *Id.* Further, Gilmour noted in 2004 that "Captain Menkes is free to apply to the [Association] for membership in that association. He is also free to apply to other pilotage associations within the Great Lakes since he will have a valid license and a valid certificate of registration as a U.S. registered pilot on the Great Lakes." Letter from T.H. Gilmour, Real Admiral, U.S. Coast Guard to Edward M. Gleason, Beins, Axelrod, Kraft, Gleason & Gibson, P.C. at 2 (Apr. 2004) [hereinafter Gilmour April Letter], *reprinted in* J.A. 68. In other words, Menkes would have to apply to the Association to "continue to earn his

---

[2] The court argues J.P. High's regulatory interpretation "displaced Flyntz's." Maj. Op. 23. But High affirmed Flyntz's decision, although he did so on alternate grounds. *See* Letter from J.P. High, Director of Waterways Mgmt., to Mark Ruge, Preston, Gates, Ellis & Rouvelas, Meeds LLP at 2–3 (May 22, 2001), J.A. 126-27. High did not expressly reject Flyntz's interpretation or even implicitly suggest it was not the agency's governing regulatory reading. *Id.* The fact remains, the Coast Guard's regulatory interpretation is far from "long standing." Maj. Op. 23. The *Agency Decision on Remand* cites no previous agency decision articulating its interpretation. Nor does the Coast Guard point the court to such authority on appeal.

livelihood as a U.S. registered pilot." Flyntz March Letter, supra page 3.

On remand, the Coast Guard "view[ed] Mr. Menkes's challenge to be a matter that is governed entirely by 46 C.F.R. § 401.720(b)." *Agency Decision on Remand* at 7, J.A. 285. In so doing, the agency specifically disavowed Mr. Flyntz' regulatory interpretation, arguing it was "never an authoritative statement," but rather, "an aberration." *Id.* at 10–11, J.A. 288–89 (finding Flyntz's statements "more consistent with exercising the authority granted in 46 C.F.R. § 401.720(b) than it is with an interpretation of 46 U.S.C. § 9304"). The *Agency Decision on Remand* thus adopted Mr. Wasserman's interpretation. But this leaves the Coast Guard with a problem the court's opinion never acknowledges: there have been two informal adjudications interpreting the agency's regulations, and they are contradictory.

If Wasserman's interpretation of the Coast Guard regulations is definitive, so is Flyntz's. Both men held the same position in the agency—Director of the St. Lawrence Seaway District. And, both made a decision about the same controversy—Captain Menkes's ability to work as an independent pilot. The fact that the *Agency Decision on Remand* validated Wasserman's view does not resolve the underlying contradiction. Nor does it transform Wasserman's interpretation into one of greater authoritative worth than Flyntz's. Under this court's precedents, a definitive interpretation can only be changed through rulemaking. *See Paralyzed Veterans,* 117 F.3d at 586; EDWARDS & ELLIOTT, supra page 2. Furthermore, even had the Coast Guard followed appropriate procedures, deference will not save a regulatory interpretation that is plainly erroneous or inconsistent with the agency's enabling statute. *See Paralyzed Veterans*, 117 F.3d at 584 ("It is certainly not open

to an agency to promulgate mush and then give it concrete form only through subsequent less formal 'interpretations.'"); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (stating regulations cannot be "manifestly contrary" to their enabling statute); *see also* EDWARDS & ELLIOTT, supra page 2, at 163 (citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)). If, as seems likely, the Coast Guard actually means to interpret the statute, there are other problems.

## II

"Not every agency interpretation of a statute is appropriately analyzed under *Chevron*." *Ala. Educ. Ass'n v. Chao*, 455 F.3d 386, 392 (D.C. Cir. 2006) (Ginsburg, J.) *Chevron* deference is afforded those interpretations having the "force of law." *United States v. Mead Corp.*, 533 U.S. 218, 229–30 (2001). It does not apply to an agency's litigation position, which provides a post hoc rationalization. *See Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212 (1988); *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1135–36 (D.C. Cir. 2001). Nor does *Chevron* govern an agency declaration unaccompanied by those procedural safeguards ensuring proper administrative practice. *See Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) (citing *Mead*, 533 U.S. at 235; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy statements . . . which lack the force of law . . . do not warrant *Chevron*-style deference."); *NLRB v. United Food & Commercial Workers Union Local 23*, 484 U.S. 112, 123 (1987) (finding *Chevron* deference appropriate when regulations are "promulgated pursuant to congressional authority"). "Otherwise the Administrative Procedure Act, which specifies how delegated power is to be exercised,

would be a dead letter." *Krzalic v. Republic Title Co.*, 314 F.3d 875, 882 (7th Cir. 2000) (Easterbrook, J., concurring).

In *Menkes II*, the Coast Guard "did not have a forthright agency interpretation of the statute." *Menkes II*, 486 F.3d at 1313. In fact, the Flyntz and Wasserman letters presented contradictory positions. As a result of this disparity, the *Menkes II* court instructed the Coast Guard to "come to grips with the meaning of the statute, and particularly, the meaning of the term 'voluntary association.'" *Menkes II*, 486 F.3d at 1314.

Assuming the *Agency Decision on Remand* represents the Coast Guard's definitive interpretation of the GLPA, the hallmarks of "fair and considered" judgment are absent. As previously noted, the Coast Guard did not conduct notice-and-comment rulemaking before promulgating its *Agency Decision on Remand*. Nor did the Agency reach its interpretive conclusion after formal adjudication. The procedures the agency employed on remand did not even meet the minimum procedural requirements contemplated for "informal adjudication" in the APA, such as the consideration of "evidence contradicting [the agency's] position." *See Butte County, Cal. v. Hogen*, 613 F.3d 190, 194–196 (D.C. Cir. 2010) (discussing, in part, procedural safeguards set up by § 706 review); *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (stating informal adjudication may consist of evidence outside the administrative record).

The agency controlled the process and the record on remand. After initially inviting Menkes to submit additional documents, *see* Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Jonathan Axelrod at 1 (Sep. 20, 2007) [hereinafter Wasserman September Letter], *reprinted in* J.A. 333, the agency expressed concerns with Menkes's

submissions, noting they contained unauthorized employee affidavits and interposing claims of privilege that were never subjected to court review, *see* Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Jonathan Axelrod at 1–2 (Oct. 18, 2007) [hereinafter Wasserman October Letter], *reprinted in* J.A. 421; *see also Agency Decision on Remand* at 35–37, J.A. 313–315. The agency said it would not consider evidence "improperly provided," not "relevant or necessary for the Coast Guard's decision." Wasserman October Letter, supra page 7, or outside the administrative record, Wasserman September Letter, supra page 7. But when the Coast Guard finally released the *Agency Decision on Remand*, it relied heavily on information outside the administrative record, notably a self-serving declaration by Paul M. Wasserman and informal communications between Wasserman and the SLSPA. *Agency Decision on Remand* at 3, J.A. 281. Pertinent here, the agency excluded evidence suggesting the agency began setting its policies only after conferring with SLSPA lawyers in a deliberate attempt to better accommodate the Association. *See* Lawler Aff. ¶ 5, *reprinted in* J.A. 349; Flyntz Aff. ¶ 9g, *reprinted in* J.A. 412 (suggesting political and lobbying pressure changed Coast Guard procedures and personnel). More than contradict certain statements in Wasserman's affidavit, Menkes's excluded evidence suggests his ouster was a predetermined act intended to curry favor with the Association, not the byproduct of a fair consideration of competing arguments. According to the agency, Menkes's proffered evidence was simply irrelevant. *Agency Decision on Remand* 36, J.A. 314. But determining relevancy *ab initio* is an all but impossible task unless the desired end is certain.

I do not mean to suggest our remand order transformed any subsequent interpretation by the Coast Guard into a ruling without the "force of law." To the contrary, the Coast Guard

had every opportunity to proceed in a fair and considered manner, following the APA's procedural requirements for delegated agency action. The agency simply chose not to do so.

Unlike agency positions taken as a result of more structured adjudicatory proceedings, whether formal or informal in nature, nothing binds the Coast Guard to its current interpretation of the GLPA. The *Agency Decision on Remand* is not published or readily available to the public—a factor distinguishing the Coast Guard's decision from a virtual laundry-list of other agencies.[3] As a result, the *Agency Decision on Remand* does not provide traditional rule-of–law values: it is not publically knowable; it lacks any assurances of stability; and litigants cannot rely upon it when challenging contrary agency action in the future. *See Sprint Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (describing informal adjudication as "'lack[ing] the firmness of a [prescribed] standard,'" not "'affect[ing] subsequent [agency] acts,'" and having no "'future effect'") (second and fourth alterations in original) (quoting *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 95–96 (D.C. Cir. 2002)); *see also* William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from* Chevron *to* Hamdan, 96 GEO. L. J. 1083, 1169–70 (2008) (arguing deference is most appropriate when agency process supports rule-of-law values). In sum, because the Coast Guard "abjure[d] the APA's procedures for making decisions," *Krzalic*, 314 F.3d at 882 (Easterbrook, J.,

---

[3] *See, e.g.*, THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION 218–28 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010) (providing a non-exclusive list of over thirty different agencies, and their various sub-branches, which publish their administrative decisions).

concurring), and because the resulting unpublished *Agency Decision on Remand* does not promote traditional rule-of-law values, the court owes the agency's interpretation of the GLPA nothing more than careful consideration. *See Skidmore*, 323 U.S. at 140.

The court argues the *Agency Decision on Remand* is a "legislative regulation[] given controlling weight" because the Coast Guard acted pursuant to authority delegated to it by the GLPA. Maj. Op. 19. This is certainly true with respect to regulations promulgated after notice-and-comment rulemaking. But the Coast Guard's regulations existed when we decided *Menkes II*; they are not the source to which we now look for the agency's "forthright . . . interpretation of the statute." *Menkes II*, 486 F.3d at 1313. A mere nod to the delegating statute in the *Agency Decision on Remand* does not in itself trigger the application of *Chevron*. Otherwise magic words could defeat *Mead*'s metric for proper obligatory deference and a mere citation could turn the *Agency Decision on Remand* into one carrying the "force of law." *See Krzalic*, 314 F.3d at 883 ("*Chevron* does not require courts to implement 'interpretations' that agencies announce without following the APA's requirements for rulemaking: following forms is a condition attached to the delegation.") (Easterbrook, J., concurring). *Mead* declared *Chevron* deference appropriate only where Congress both "delegated authority to the agency . . . and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226–27. Thus, under *Mead*, all expressly delegated agency action does not garner an Article III rubberstamp. If that were the case, we would have deferred to the Health Care Financing Administration's PRO manual in *Public Citizen, Inc. v. Department of Health & Human Services*, 332 F.3d 654, 659–60 (D.C. Cir. 2003), the settlement agreement in *Southeastern Federal Power*

*Customers v. Geren*, 514 F.3d 1316, 1327 (D.C Cir. 2008) (Silberman J., concurring), and judges would apply *Chevron* to interpretations of the Sherman Antitrust Act by the Attorney General or interpretations of RICO by prosecutors, *cf. United States v. Western Elec. Co*., 900 F.2d 283, 297 (D.C. Cir. 1990).

The court also says *Chevron* deference is owed under *Barnhart v. Walton*, 535 U.S. 212, 222 (2002). Maj. Op. 20–21 But *Walton* is an odd case upon which to rely as it involved regulations promulgated after notice-and-comment rulemaking and clearly entitled to deference under *Mead*. *Walton*, 535 U.S. at 217. *Mead*, of course, acknowledges *Chevron* may apply amidst more informal circumstance, but fails to elaborate further. *Walton* fills this doctrinal gap in dicta by suggesting various factors define *Chevron*'s applicability when notice-and-comment rulemaking does not occur. Yet I do not read *Walton*'s dicta to gut the framework *Mead* painstakingly constructed the year before—separating and sequencing questions concerning the deference owed an agency and those concerning statutory interpretation. This is especially true given *Chevron*'s approach—accepting "a range of permissible interpretations" and that "the agency is free to move from one to another"—calls into serious doubt *Walton*'s reliance on the vintage of an agency's interpretation. *Walton*, 535 U.S. at 226 (citing *Rust v. Sullivan*, 500 U.S. 173, 186–87 (1991); *Chevron*, 467 U.S. at 863–64).

In any event, the *Walton* factors do not "indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." *Walton,* 535 U.S. at 222. First, the court suggests the GLPA authorizes the Coast Guard "to set parameters for voluntary associations." Maj. Op. 20. But this conflates "voluntary associations" and "pilotage pools." The statutory text only

authorizes the Coast Guard to promulgate rules pertaining to the latter, not the former. 46 U.S.C. § 9304(b) ("For *pilotage pools*, the Secretary may— . . . .") Furthermore, the GLPA enumerates five ways the Coast Guard may regulate pilotage pools, none of which include the authority to limit pilotage pools' composition—such as by requiring registered pilots to be members of a "voluntary association"—to anything but "United States registered pilots." Second, the court argues deference is appropriate because the *Agency Decision on Remand* addresses "interstitial" questions, the potential ramifications of which could "impact[] myriad aspects of the regulatory scheme." Maj. Op. 21. Of course, the pervasiveness of the court's suggested ramifications implies the question presented does not fill a regulatory "gap," but rather strikes at a keystone of regulatory design. Either way, the Coast Guard does not make this argument and there is no record evidence these "ramifications" will come to fruition. For starters, how the Association would apportion costs if it chose to dispatch non-members pro-rata remains a mystery. Further, these "ramifications" could only occur if non-association members—like Menkes—could free-ride, and Menkes offers to pay his "share of the costs," which presumably includes the equivalent of an equity stake in the association and any sur-charge assessed for dispatching the pilotage pool on a pro-rata basis. And even if the court's predictions prove correct, the "interstitial" nature of the question presented is but one of *Walton*'s many non-dispositive factors. Finally, unlike this case, the regulations in *Walton* "reflect[ed] the Agency's own longstanding interpretation." 535 U.S. at 219. The court's insinuation the same is true here is risible. We remanded in *Menkes II* because the Coast Guard "did not have a forthright agency interpretation of the statute," let alone an interpretation it consistently applied over time. The court accepts the agency's bald assertion that its interpretation of "voluntary

association" is longstanding. But the *Agency Decision on Remand* cites no previous agency decision articulating its interpretation and only cryptically refers to a past settlement between the agency and the pilots' association, which pertained to the "wording of 46 C.F.R. § 401.720(b)," not § 9304 of the GLPA. *Agency Decision on Remand* at 9, J.A. 287.

In *Menkes II*, we characterized the Coast Guard's varied interpretations as deriving from an "informal adjudication" with a sparse record and questioned whether deference would be owed such a proceeding under *Mead*. *Menkes II*, 486 F.3d at 1314. Unfortunately, remand was no remedy. The proceedings remain far-removed from "notice-and-comment process" and "other circumstances reasonably suggesting" the Coast Guard's newfound interpretation has the "effect of law." *Mead*, 533 U.S. at 230, 231. The theoretical framework for administrative review assumes a structured, rule-of-law infused process. In reality, however, the process is often an ad hoc and idiosyncratic pastiche in which the rules, and the rules of engagement, can be distressingly protean. This case is a paradigmatic example. Regardless if the *Agency Decision on Remand* interprets Coast Guard regulations or the GLPA itself, deference is not appropriate.

III

The GLPA authorizes the creation of "a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services." 46 U.S.C. § 9304(a). As the court concludes: "[i]t is not clear from the text of 46 U.S.C. § 9304 whether a voluntary association can decide to dispatch only its members, for the term 'voluntary association' is undefined." Maj. Op. 22. To this extent, I agree. The term

"voluntary association" is a changeling, capable of multiple meanings. But the absence of a statutory definition does not mean Congress failed to answer the question at issue. A careful analysis of the meaning commonly ascribed to "voluntary association," § 9304(a)'s plain language, the broader statutory context, and the underlying purpose of the GLPA reveals a more precise meaning.

As a preliminary matter, an "association" is not "voluntary" if "membership . . . is necessary, in a substantial sense, for the practice of one's profession." BALLENTINE'S LAW DICTIONARY 1350 (3d ed. 1969). This definition comports not only with its legal usage at the time Congress passed the GLPA, *see id.* at 1350 (defining "voluntary association" as "[a]n association in which one may seek, or be accepted into, membership as a matter of choice.") (citing 6 AM. JUR. 2d *Associations and Clubs* § 1), but also how courts utilize the term in the case law*, see*, *e.g.*, *Goldfarb v. Va. State Bar*, 421 U.S. 773, 776 (1975) (contrasting the Fairfax County Bar Association, which "as a purely voluntary association of attorneys . . . ha[d] no formal power to enforce" a bar requirement, with the Virginia State Bar, in which "membership . . . is required in order to practice in Virginia"); *Lathrop v. Donohue*, 367 U.S. 820, 832–33 (1961) (plurality opinion) (noting that "integrated" bars arose because efforts to accomplish the desired ends "through voluntary association had not been effective"; "membership in the voluntary association ha[d] become static"); *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 796 (1961) (Black, J., dissenting) (contrasting union-shop agreements with "[u]nions composed of a voluntary membership," and explaining that "to the extent that Government steps in to force people to help espouse the particular causes of a group, that group—whether composed of railroad workers or lawyers—loses its status as a voluntary group"); *In re China Union Lines, Ltd.*, 342 F.

Supp. 426, 428–29 (E.D. La. 1971) (characterizing a pilots' association as a "purely voluntary private organization" where a member could be divested of his membership "and, yet, continue to retain his commission and work as a licensed Crescent River Port Pilot"); *Firemen's Pension Fund, by Smith v. Minnaugh*, 80 Pa. D. & C. 297, 303 (C.P. Dauphin Cty. 1951) ("The element of voluntary association is lacking in the Firemen's Pension Fund. This fund was established by legislative mandate. Membership in the fund is involuntary and contributions thereto are made mandatory upon the paid members of the fire department."). Thus in context, the term "voluntary association" means the Coast Guard has to provide pilotage services through registered pilots and can utilize voluntary associations to handle recruitment, training, and dispatch.

The language of § 9304(a), and the Coast Guard's own interpretive regulations promulgated thereunder, do not support the Coast Guards' interpretation, as neither equates "pilotage pools" from which registered U.S. pilots are dispatched, with "voluntary associations" potentially tasked with administering the dispatch of pilots from the pools. The statutory text says the Coast Guard "*may* authorize the formation *of a* pool *by a* voluntary association." 46 U.S.C. § 9304 (emphases added). The court makes this same error, suggesting at times the SLSPA is a "pilotage pool," Maj. Op. 6, and at times it is a "voluntary association," Maj. Op. 2. Moreover, under existing Coast Guard regulations, voluntary associations "*can* establish" a pool or pools, thereby indicating the two terms are not interchangeable. 46 C.F.R. §§ 401.300, 401.320, 401.340(b). Indeed, at least one regulation (46 C.F.R. § 401.340) provides for the dispatch of non-member pilots from the pilotage pool and "grants the pilots' association authority to deny the facilities and services of the pool to pilots refusing to agree to important terms for

participation in the pool." *Agency Decision on Remand* at 9–10, J.A. 287–88.  Although the Coast Guard may be correct in arguing § 401.340 does not "explicitly address whether a pilots' association must otherwise make the facilities and services of the pool available to non-member pilots," *Agency Decision on Remand* at 9, J.A. 287, it fails to recognize that § 401.340 implicitly does just that.  If the reasons for denying a pilot dispatch are not limited to a refusal to pay or a violation of work rules, the association could refuse to dispatch a pilot on mere whim, without any specific rule authorizing its denial.  Section 9304 suggests pilotage pools and voluntary associations are separate, distinct, and not coextensive.  The Coast Guard's own regulations support this point by outlining specific criteria governing when a voluntary association may deny registered pilots access to pilotage pools.  Membership in a voluntary association is not the same as, and need not be a precondition for, membership in the pilotage pool.

The greater statutory context also sheds an interpretive light.  Section 9303 requires U.S. registered pilots to meet certain "standards of competency."  46 U.S.C. § 9303(a).  If a pilot meets these "conditions for service," *id.* § 9303(d), the Coast Guard must "issue . . . a certificate of registration," *id.* § 9303(b).  In this respect, the GLPA promotes maritime safety by explicitly setting objective standards of qualification for registered U.S. pilots, including requiring applicants to "have a license as a master, mate, or pilot," *id.* § 9303(a)(1), and to have at least twenty-four months' experience operating towing vessels on the Great Lakes, *id.* § 9303(a)(2).  Interpreting "voluntary association" in § 9304 to allow the association ultimate control over the dispatch process imposes an additional subjective and a-textual condition for employment of registered pilots—membership in the Association.  It is no longer sufficient for an applicant to meet

the regulatory "conditions for service" if he cannot also navigate the politics of the association. As a result, a certification process designed to focus on safety circuitously becomes one focused on sycophancy. Here, Menkes sought work through the Association as a non-member. The SLSPA refused to dispatch him, however, and even informed the Canadian pilot association that Menkes could not be dispatched in District One despite his standing as a registered U.S. pilot. *See* letter from Roger S. Paulus, President, St. Lawrence Seaway Pilots' Association, to Robert Lemire at (March 26, 2004), *reprinted in* J.A. 62.

The Agency, in contrast, relies on a series of descriptions gleaned from a general encyclopedia of law, American Jurisprudence, to support its argument that allowing the SLSPA to compel membership and screen pilots before dispatching them to work on the Great Lakes is consistent with the way "voluntary" is used in the statute. *Agency Decision on Remand* 12, J.A. 290. The court capitulates, swept away by the under-current of a powerful deference regime. I find *Chevron*'s ebb tide less beguiling. Why would the government delegate authority to a voluntary group, operating without constraints, to have complete power over someone's livelihood? The Association could impose a rule by nepotism, or discriminate on the basis of race, gender, religion, or just plain cussedness, insulated from constitutional scrutiny only by the porous and symbolic distinction between state and private action. In any event, American Jurisprudence did not always define "voluntary association" in this way. During the time Congress passed the GLPA, as well as in the decades following, the encyclopedia read:

> The term "voluntary" is frequently used in connection with the term 'association' or 'society,'

and some principles of law are confined, in their operation, to 'voluntary' organizations. In this connection, the term means simply that the organization is one in which one may seek, or be accepted into, membership in the organization as a matter of choice. If membership is required by legislative mandate, as in the case of public officers or employees, such an organization is not a 'voluntary' organization.

6 AM. JUR. 2d *Associations and Clubs* § 1 (1963); *see* 6 AM. JUR. 2d *Associations and Clubs* § 1 (2007) (same).

Allowing the Association exclusive control over the composition of pilotage pools also creates an odd incentive and undermines the safety-promoting purpose of the GLPA. Recall, when the association has a "physical or economic inability to [provide service]," the Coast Guard may order "any U.S. registered pilot to provide pilotage service." 46 C.F.R. § 401.720(b). Thus, to maintain control, the Association must be able to provide adequate service. Between the 2001 and 2003 navigation seasons, the Association faced an attrition problem which left it physically unable to provide adequate pilotage service. The court suggests the SLSPA was not responsible for the pilot attrition problem. This may be true. But I do not understand its relevance. If the association's service is not adequate, the Coast Guard can act. Moreover, to the extent the attrition problems resound from issues with recruitment, training, and pilot compensation, they suggest the SLSPA was responsible. The Association solved its attrition problem by hiring both contract pilots, including one who "had never been certified as an independent pilot," J.A. 357, and new pilots who had not finished the statutory required training and needed "to receive a temporary registration permitting them to go pilot

boat to pilot boat while continuing their training for ports," J.A. 311. Thus, in lieu of a registered pilot with over thirty years' experience, seasoned and intimately familiar with the water in which he works, the Association dispatched pilots with the equivalent of learners' permits to maintain exclusive control over the pilotage pool.

The court upholds the reasonableness of the agency's interpretation at Chevron step two by focusing on various perceived gains in efficiency. Notably, the court accepts the Coast Guard's rationale that allowing "voluntary associations" to exclude registered pilots from the pilotage pool (1) "'removes the Director from day to day involvement'"; (2) "'allows the pilots' associations . . . to apply their expertise'"; and (3) "'promotes retention of pilots, by giving the pilots in the association some control over decisions that will affect the financial health of the pilots, the pilots' association and other entities that may provide infrastructure support to the pilots.'" Maj. Op. 23 (quoting *Agency Decision on Remand* at 15, J.A. 293).

Of course, the Director's removal from day-to-day operations would occur whether the association dispatches non-members or not. It is also difficult to defend the Association's monopoly power as efficiency producing when applying more exacting scrutiny. Generally speaking, market competition—not cartels—produce efficiency gains and public benefit, which in this context may mean the dispatch of more experienced pilots and greater overall safety. Cartels, on the other hand, improve the profitability of their own participants. Or, as the Coast Guard might say: "'giv[e] the pilots in the association some control over decisions that will affect the financial health of the pilots.'" Maj. Op. 23 (quoting *Agency Decision on Remand* at 15, J.A. 293).

Finally, although I agree *Menkes v. St. Lawrence Seaway Pilots' Ass'n*, 269 F. App'x. 54, 55 (2d Cir. 2008), precludes Menkes's First Amendment claim, I do not think the underlying constitutional issues—if properly presented—are so clear cut. The canon of constitutional avoidance therefore also cautions against the Coast Guard's statutory reading. *See Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them.") (emphasis omitted) (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 237–38 (1998); *United States ex rel. Attorney General v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)); *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (discussing constitutional avoidance as a means of circumventing "grave and doubtful constitutional questions."). By raising constitutional avoidance I do not mean to suggest a constitutional violation has occurred; nor that "grave" constitutional questions persist. This is not a case in which competing interpretations are in equipoise. I invoke constitutional avoidance in the alternative only to suggest the constitutional question is not as simple as the court makes it seem; to the extent the canon colors interpretation of the statute, its gloss does not favor the Coast Guard's reading.

The court relies upon "agency shop" cases for the proposition that the Coast Guard can compel Association membership as a condition of employment. Maj. Op. 25–26. This reliance strikes me as misplaced. Unlike "agency shop" cases, no "free-rider" problem exists here. *See Keller v. State Bar of Calif.*, 496 U.S. 1, 12 (1990) ("The reason behind the legislative enactment of 'agency-shop' laws is to prevent 'free riders . . . .'"); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 221–22 (1977) ("A union-shop arrangement . . . counteracts

the incentive that employees might otherwise have to become 'free riders,' to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees."). Captain Menkes offers to pay his "share of the expenses," Or. Arg. 32:57–33:00, and the Association does not dispute he did so during the 2001, 2002, and 2003 navigation seasons.[4] In addition, the government's interest here—regulating pilotage—does not justify impinging Menkes's First Amendment rights in the same manner as the government's interest in the "agency shop" cases. Exclusive union representation "is a central element in the congressional structuring of industrial relations." *Abood*, 431 U.S. at 220. Utilization of a voluntary association, by comparison, is not mandatory; the Coast Guard's authorization to do so is discretionary.

The more apt analog is the Supreme Court's professional licensure cases. In *Schware v. Board of Bar Examiners of New Mexico*, a State Board of Bar Examiners prohibited an

---

[4] The court says Menkes "did not offer to purchase the equity stake . . . that members are required to purchase." Maj. Op. 26. It is true Menkes objects to the requirement that he purchase stock in Seaway Pilots, Inc., which owns the pilot boats. But the relevant Coast Guard regulations allow the voluntary association to "bill for services," 46 C.F.R. § 401.340(b), and registered pilots must "comply with [the association's] working rules," *id.* § 401.340(a). Menkes signed a "written authorization" agreeing to do just that. At oral argument, Menkes reiterated he would pay his "share of the expenses." Or. Arg. 32:57–33:00. It does not follow from Menkes's objection that his "share" does not include any marginal fixed costs incurred by Seaway Pilots, Inc. on-top of whatever operational costs incurred by the Association when Menkes is dispatched. The regulations allow the inclusion of such costs when the Association bills Menkes.

applicant from sitting for the bar exam because he was previously a member of the communist party. 353 U.S. 232, 234–35 & n.2 (1957). The Court held the act unconstitutional under the Due Process Clause, reasoning the state bar association could not exclude an individual from the practice of law because the individual failed to satisfy a "standard[] of qualification" having no "rational connection with the applicant's fitness or capacity to practice [a given trade]." *Id.* at 238–39; *see also Dent v. State of West Virginia*, 129 U.S. 114, 124 (1889) (upholding medical licensing requirements because the requirements were not arbitrary). Applied here, *Schware* and *Dent* serve a useful warning. Wielding the government's imprimatur, the "voluntary association" can arbitrarily exclude qualified pilots from working on the Great Lakes. The court suggests Menkes did not raise this point. Maj. Op. 26. But this is just wrong. Throughout this litigation, Menkes alleged the SLSPA engaged in nepotism and arbitrary membership decisions. *See, e.g.*, Menkes Aff. ¶ Exhibit A, *reprinted in* J.A. 159. Of course, arbitrary exclusionary practices have not always sounded constitutional alarms in the context of tug-boat pilotage. In *Kotch v. Board of River Port Pilot Commissioners for Port of New Orleans* the Court approved regulations condoning nepotistic hiring of river boat pilots, allowing in effect the exclusion of applicants on the basis of race, gender, or religion. 330 U.S. 552, 565 (1947) ("Blood is, in effect, made the crux of selection."). Curiously, the state justified its regulations on a "relationship to the end of securing an efficient pilotage system" there too. *Id.*

In sum, I do not read the term "voluntary" to compel Association membership. This interpretation comports with the common definition of the term "voluntary association," the plain language of § 9304, the surrounding statutory context, and the underlying purpose of the GLPA. It also

avoids constitutional implications which may occur when the Government condones the use of arbitrary means of excluding individuals from their chosen profession. Even applying *Chevron*'s deferential standard, I would reverse the district court in part, holding the Coast Guard's interpretation of § 9304 as unreasonable and "contrary to law." 5 U.S.C. § 706(2).

IV

In *Menkes II*, the Coast Guard's inability to explain its actions was troubling. The court went to considerable lengths to suggest the appropriate seriousness with which the agency should have approached the opportunity to clarify itself on remand. This is not an easy case. Nor should it be. It ought to be difficult to conclude Congress condoned the establishment of a cartel or guild unfettered by the strictures of the APA to which the responsible federal agency would be subject. What *public* interest does ceding so much power to the Association serve? Why should the Association be free to act arbitrarily and capriciously when the Coast Guard clearly could not? On remand, the Coast Guard apparently eschewed judgment in favor of justification. In the process, the agency jettisoned even the most minimal procedural safeguards designed to ensure it acted in a "fair and considered" manner. Consequently, I do not believe deference is due.

Pilotage on the Great Lakes is a difficult and dangerous job. Those who choose it as a profession often come from a certain proud lineage. The GLPA regulates the profession by setting out safety requirements and other responsibilities for the Coast Guard to administer. For example, if it so chooses, the Coast Guard "may authorize the formation of a pool by a voluntary association . . . for efficient dispatching of vessels and rendering of pilotage services." 46 U.S.C. § 9304. I do

not read this language to allow the "voluntary" association to compel membership in its organization before dispatching pilots. Such an interpretation seemingly conflicts with the definition of "voluntary association," the statute's plain language, broader context, and underlying purpose. But reading the statute in this way, the Coast Guard places the government's imprimatur behind the Association, providing it monopoly power over District 1 pilots, and allowing the Association to exclusively set the conditions under which pilots may work. Granted, the Supreme Court previously condoned a similarly arbitrary and discriminatory exercise of state power against constitutional attack; and it did so in the context of river boat pilots, a profession that shares more with Great Lakes pilotage than just its nautical roots. *See Kotch,* 330 U.S. at 565. But I am confident that decision is a relic of a time past, now serving only as a historical bookmark, rather than a contemporary statement of the law. The court's deference makes me question whether I am too optimistic.